# Internal Revenue Service
# Criminal Investigation

## Memorandum of Interview

**In Re:** Steven K Randock **Location:** Spokane

**Investigation #:** [redacted]
**Date:** December 13, 2005
**Time:** 1:30pm
**Participant(s):** [redacted] Interviewee
[redacted]
[redacted]
[redacted], Special Agent
[redacted] Investigator

1. [redacted] agreed that this interview would be conducted under terms of a free talk letter signed by [redacted] and [redacted]. [redacted] then provided the following information:
2. [redacted] stated that he was aware and had been aware that the schools operated by Dixie Randock were "diploma mills." He said he understood diploma mills to mean they sold degrees as a product for financial gain. He also stated that the degrees were not a real product as he knew people who bought a PHD through the schools did not spend six years earning a degree.
3. [redacted] said that when he first started working for SRU in March of 2002 he didn't know what a diploma mill was. However, after he began working for Dixie she sent him many emails (often from people posting statements on a website called degreeinfo.com) which "slammed" SRU and he quickly learned what a diploma mill was.
4. [redacted] acknowledged that he would not want an attorney with only an SRU degree because he knew where the diploma came from and the attorney would not be qualified. He said that he used to joke that if he saw an SRU diploma in a doctors office he would not want the doctor to treat him.
5. [redacted] said his prior work history included selling time shares in Mexico in the 1980's. He also worked for Ugly Duckling as a manager until 1997. He advised that Ugly Duckling financed cars for people who could not get conventional car loans. From 1997 to 2002 he owned a company called [redacted] Auto Wholesale. However, he got out of this business because he wasn't making any money. [redacted] said that about 3 months prior to March of 2002 the subject of [redacted] possibly working for Dixie came up. He said around this time he went with the [redacted] out to Dixie's office in Mead. He hadn't seen Dixie in about 10 years and had never met Steve Randock. Dixie later became aware that [redacted] was

GOVERNMENT EXHIBIT 19

not working (he had just got out of his car sales business) and she knew he was looking for a new job. [redacted] said he had experience traveling to foreign countries (he had worked and lived in Mexico).

6. Dixie told [redacted] that she had a degree business and needed someone to go to Washington, DC to get authentications and apostiles. She said she owned St. Regis and the school offered Bachelor to PHD degrees based on prior life experience or prior education. Each student would fill out an application on line and submit it to an advisor. Dixie said she needed authentication for these degrees. [redacted] said he agreed and started knocking on doors to figure out how to do it. He said Dixie agreed to pay him between $150 and $250 per document. [redacted] understood that Dixie would charge consumers up to $1,800 for whole packages that included several of these documents. [redacted] said Dixie made a profit as she charged customers more than what it cost to obtain these documents.
7. [redacted] said he went to Washington, DC about 10 times in the last 3 years and he estimated he obtained around 200 to 300 documents. He explained a typical trip as follows:
8. After [redacted] reached Washington, DC he went to [redacted], a notary who owns a medical screening business there. The business is called [redacted]r and is located at [redacted], WA DC. [redacted]otarized "Authentication Attestations" (see attached exhibit 602332). Her notarization essentially said that [redacted]'s signature on this paper was true. She charged $2 for each notarization she did.
9. [redacted] then went to the United States Secretary of State office in DC. He then obtained one of two documents from the Secretary of State office. If the documents were to go to a Hague country (approximately 50 countries including Brazil, UAE, Switzerland, etc) he went and got an apostile. The apostile basically says that [redacted] (the notary) was who she said she was (a valid notary). Exhibit 602331 is an example of this and [redacted] said this document cost $10.
10. If the documents were to go to a non-Hague country he obtained authentication (exhibit 602325). This said essentially the same thing as an apostile and also cost $10. If the documents were to go to a non-Hague country he also needed another document with Colin Powell's name on it that essentially said the authentication was from Washington, DC. An example of this is exhibit 602321.
11. [redacted] said after he had all these documents he dropped them in a Fed-ex or DHL envelope and sent them to [redacted] The packages were billed to Dixie's corporate account with these overnight services.
12. [redacted] said he never saw the completed packages that went out to the customers. He said it was his understanding that the paperwork went on the degrees Dixie was selling and that those degrees were not real. He said he was aware that his name was on some of the paperwork as [redacted] "Director of University Services, Inc." He said this was a title that Dixie came up for him.
13. He said the apostiles and authentications essentially didn't say anything. He said "you could have attached a dog license to the paperwork" he obtained and it would have meant as much. He said that to his knowledge, none of the degrees ever sent out by SRU or the other Dixie controlled schools was valid or

authentic. [redacted] said he confronted Dixie about the paperwork he was obtaining and how it didn't really say or mean anything. He said she never gave him a real answer.

14. After obtaining only a few of these documents on his first trips to Washington, DC, Dixie came up with the idea to get more of these apostiles and authentications each trip so [redacted] would not have to make so many trips. Thereafter he would get about 30 to 40 documents each trip. He said the most he ever got was around 50. [redacted] said there was a problem with this. All the documents had the same date on them. One of the ways they got around this problem was to send [redacted] to Washington, DC in January and June, as colleges usually graduated students around that time. [redacted] said another way they got around this problem was by backdating diplomas. [redacted] said he saw emails from Dixie or others talking about backdating diplomas to when the authentications were obtained.
15. [redacted] said he was only paid by Dixie for the documents that were actually used. He said he was paid between $150 and $250 per document according to an email from Dixie that listed everyone's pay.
16. [redacted] said that when Dixie began to give him a title that he knew was undeserved this "raised red flags" with him. He expressed his concerns to Dixie but she said he had to have a title.
17. [redacted] described Dixie as the leader of the operation. He said he had also heard her yell and scream at employees. He said Steve Randock's role was that he took care of the finances. Steve was the one who would send money by Western Union to Liberia. Steve also handled the advertising expense from the websites.
18. Roberta or "Berta" handled printing and mailing the degrees.
19. Amy Hensley handled the finances for the schools and also for A+ Institute. She also worked as an advisor for SRU.
20. Heidi was the daughter of Dixie and was an advisor. Ken Pearson took care of the companies computer needs. [redacted] only met Pearson twice.
21. Dixie told him they moved from their office in Mead because there were rumors they would get "heat" from the Washington State Attorney General's office.
22. [redacted] said when he first went to Washington, DC, in June of 2002, they did not have accreditation with Liberia. On his second trip to DC, Dixie said to him that she wanted accreditation from a country and she recommended that he go try to get Liberian accreditation. [redacted] asked her why she couldn't get accreditation in the US and she told him something to the effect that "for what we do, you can't get accredited in the US." [redacted] said at that time he did not know exactly how Dixie's school worked.
23. [redacted] said that on this second trip to Washington, DC, he took a cab to the Liberian embassy. He walked to the front door and knocked. A man named [redacted] answered the door. [redacted] told him why he was there and [redacted] went and brought back [redacted] took [redacted] to a conference room where they talked. [redacted] explained SRU was an on-line university. [redacted] asked [redacted] something to the effect "what do I have to do to get accreditation for SRU?" [redacted] asked him where the school was located and [redacted] told him Washington State. He also showed [redacted] the catalog of courses. (exhibit 602569) [redacted] told [redacted] he would find out what could be



provided and how much it would cost.

24. [redacted] said either the same day or later that day, [redacted] told him he could get documents saying the school was accredited signed by the commissioner of higher education for Liberia, a [redacted]. [redacted] said [redacted] said it would cost $4,000. [redacted] said he negotiated with [redacted] and they ultimately agreed on $2,250. [redacted] said this occurred on 8-28-02, according to his notes.

25. [redacted] said he believed, when he negotiated with [redacted], that the money was not going to the Treasury of Liberia. It was his understanding that this was a bribe and the money was going to [redacted]. He said one of the reasons he knew this was a bribe was because his discussion with [redacted] was about getting the documents and how much it cost. [redacted] was not concerned with the whether the schools taught anything or questions like that. [redacted] said although he assumed most of the bribe money went to [redacted] he found out later that [redacted] received most of it.

26. [redacted] was shown documentation regarding a wire of $10,000 in January of 2003. He was not sure what this was for.

27. [redacted] said he personally gave the $2,250 to [redacted] in cash at the Liberian embassy in Washington, DC. He said on another occasion he gave $1,000 to [redacted] in [redacted]'s hotel room in Liberia. The $1,000 was for additional accreditation documents.

28. [redacted] said another time he gave [redacted] $4,000 in cash. He said Steve and Dixie were in DC with [redacted]. They met [redacted] in [redacted]'s hotel room and gave him the $4,000. This was sometime before the Ghana peace talks.

29. [redacted] said when he went to Liberia he stayed at a hotel near the embassy. He said the shortest stay he had in Liberia was three weeks.

30. After he obtained the accreditation from Liberia Dixie put it on her website that Liberia had given them accreditation. The Liberian embassy then was swamped with phone calls and degree questions. [redacted] was upset so Dixie began paying him $400 per month for his employees to answer questions about SRU at the embassy and to say SRU was real and accredited.

31. Dixie had Ken set up the Liberian embassy web site. [redacted] said that [redacted] from the embassy supplied the info and photos to Dixie. When [redacted] found out about it he was the one who closed it down.

32. [redacted] said that Thomas Carper was an alias or fictitious name used by Dixie Randock.

33. [redacted] was a man who scammed Dixie out of $60,000 or $80,000. [redacted] has spoken with [redacted] on the phone. [redacted] had a partner named [redacted].

34. [redacted] lives in Ohio. He runs an on-line school in [redacted] has spoken with him once on the phone in 2002 or 2003.

35. [redacted] said he believed that although he began working for Dixie in 2002, he didn't realize she was selling fraudulent degrees until later. He estimated that by 2003 he definitely knew she was selling fraudulent degrees. He explained by saying that although Dixie said the schools were legitimate, she sent him numerous emails that came from degreeinfo.com that said a lot of bad things about SRU. [redacted] said after seeing so many emails he figured out this was not right. He said that he also knew that all the people Dixie associated with, including [redacted], [redacted], and [redacted] were all thieves

36. [redacted] said that in around December of 2003 or January of 2004, he went with



Dixie and Steve and [redacted] to Detroit and met with [redacted]. He said [redacted] owned a company called [redacted] set up a deal between SRU and the UAW. [redacted] spoke to the UAW heads of departments. UAW went for the program which was to pay for SRU degrees. A lot of people signed up, but [redacted] got the money and put it in his own bank account.

37. [redacted] said that Dixie had the idea to hire professors in Liberia and have them answer questions. [redacted] said this did not work because there is no technology in Liberia. There are no phone or fax lines. [redacted] said he did go to 10 professors at the [redacted] in Liberia and collected their CV's (curriculum vitae(sp)). He told them they would get paid if they answered questions for SRU. However, due to the technology problems, they never worked for SRU and never got paid.

38. [redacted] said [redacted] was an honest man [redacted] who lived in Liberia. He was the manager of an internet café and was the brother-in-law of [redacted]. [redacted] rented 73 Carey St. in Monrovia, Liberiafor SRU. This location was blown up in the war in 2003 or 2004.

39. Dixie made up a lot of title for [redacted]. She also made up titles for other people too. [redacted] noted one document from a file titled "copies" said "Dr. [redacted]." [redacted] said [redacted] was not a doctor. Dixie, however, wanted 100% annonimity for herself.

40. [redacted] recalled when he first met [redacted]. [redacted] went to Liberia and met [redacted] took him to meet [redacted] went to the education building which had no electricity and [redacted] took him to the third floor. [redacted] was in an office behind a big desk. [redacted] told him this was the commissioner of higher education, [redacted] [redacted] told [redacted] he was there to get accreditation for SRU. [redacted] said something to the effect of "fine" and said it would cost a certain amount. [redacted] then negotiated with [redacted] and they agreed on a reduced amount.

41 [redacted] said that once the negotiation started he knew that the money he would be paying [redacted] was going into [redacted]'s pocket. He later gave [redacted] cash in [redacted]'s hotel room and waited in Liberia until he got the certificates saying SRU was accredited. He estimated he waited 7 to 10 days for these documents.

42. [redacted] was shown a document that said SRU was chartered in Liberia on 1-10-84 as a private school with a physical campus. [redacted] said this was a fraudulent document. He said he believes this document was even posted on the SRU website. [redacted] went to Dixie and said to her, "why say these things .....this opens a can of worms." [redacted] said he knew it would cause problems to lie like this. [redacted] said Dixie was so affixed on proving the school was real that she lied by posting this letter and she "lied about everything."

43. Regarding a certificate dated 10-16-03, [redacted] said [redacted] created this to show accreditation for SRU. He said later, on another trip, he received similar ones for Roberstown and James Monroe. (these documents came from the copies folder also) He estimated the total cost for all these certificates was between $6,000 and $8,000. [redacted] said that any Western Union wires sent to Liberia was money that went to some Liberian official.

44. [redacted] said he paid [redacted] at least two times for accreditation documents.

45 [redacted] said [redacted] was the deputy commissioner of education. [redacted]



met with him many times. sent out a letter saying SRU was not accredited by Liberia. Then r told him to find k said he knew what that meant. He knew he needed to meet and pay him cash only to change his mind.

46. did meet with d, through told him they had to have an office and equipment in Liberia. set up the office, including renting space in a building for about $10,000 to $15,000 per year. Steve Randock sent some computers via regular mail to Liberia, but they never arrived. He later sent more computers. said it cost $1,200 to put up an internet pole and $300 per month to connect to the internet. said they finally got one computer (out of 3) to work and did work in the office for a few hours each day,

47. k said he did pay cash bribes to also received a $400 per month from Dixie and Steve via Western Union. k also gave him $100 to fix his car on one occasion.

48.

49.

50. was shown a several documents paperclipped together. The last page was a letter from the ministry of education and had the signature of and . k said he was aware that paid . These documents came from 's home. said that he never filled out any type of form or application to get accreditation from n. He said his contacts with were all spoken words.

51. k was aware of a letter Dixie composed that she wanted the Liberian embassy to send to . Dixie gave the letter to and k faxed the letter to r. r then sent the letter to n Oregon. Letter (exhibit # ) is the response to that letter.

52. was aware that n did call s on at least one occasion to see why he was questioning SRU.

53. commented on a memorandum of understanding dated March 31, 2004 by " ." (this came from the copy's file) said that during the Liberian war an Alumni of SRU collected money to send to Liberia. This man was one of the professors or staff of SRU. He collected possibly as much as $10,000.00. Dixie called and wanted to know how to get this money to Liberia. k called a to see if he could help disburse funds. a drafted the above referenced memo of understanding. However, after committed the money, Dixie withdrew from this agreement. did not know if Dixie kept the money.

U.S. v. Dixie Randock Et Al [redacted] 110019

Special Agent

I prepared this memorandum on 12-15-05, after refreshing my memory from notes made during and immediately after the interview with [redacted]

Special Agent

Memorandum Page 7 of 7 U.S. Treasury Criminal Investigation

**U.S. Department of Justice**
*United States Attorney*
*Eastern District of Washington*

DATE: January 11, 2006

**Interview Record**

**Interview of:** [redacted], [redacted]

**Interviewers:** [redacted] Investigator [redacted], USAO and Investigator [redacted] Washington State Attorney General, and Attorney [redacted]

**Interview Location:** United States Attorney's Office, Eastern District of Washington.

**Purpose of Interview:** [redacted], [redacted] this interview would be conducted under terms of a free talk letter signed by [redacted] and [redacted] provided the following information:

1. Dixie Randock told [redacted] he should not use his real name and should develop a company/dba to access apostilles, notaries and the paperwork for the Saint Regis University (SRU) schools. Dixie and Steve Randock told [redacted] to incorporate in either Nevada or Delaware. [redacted] subsequently incorporated a business in Nevada called "U.S. Documents." Amy Hensley told [redacted] to set up a bank account which he opened at [redacted] always used "direct deposit." He was paid for obtaining apostilles, notaries, authentications and also commission payments for sold degrees.

2. [redacted] would obtain the apostilles, notaries and authentication documents from Washington,DC and various states and mail them through DHL (a freight mail service) to AEIT and A+ Institute, Attention [redacted] at the Mead Washington address.

3. [redacted] had an arrangement with Dixie Randock to get 10% of whatever was sold to other affiliate schools (example Breyer State).

4. [redacted] asked Dixie Randock the meaning of AEIT. Novak understood it to mean "Advanced Education Institute." Dixie told [redacted] it stands for whatever you want it to.

5. Dixie came up with the name AEIT and she owned it. She also owned A+ Institute. At one time Dixie Randock had several real estate offices (Century 21) then she started writing real estate courses applicable to various states. [redacted]

6. [redacted] has known Dixie Randock since high school. She went to Rogers High School in Spokane and he attended Lewis and Clark and Central Valley High Schools. Dixie did not attend college and is self-taught.



7. [redacted] has only known Steve Randock for the last ten years.

8. [redacted] received e-mails from Dixie Randock about setting up off-shore bank accounts. [redacted] remembers e-mails regarding Panama and Cypress as good places to set up accounts.

9. Dixie Randock told [redacted] she started SRU. She had received e-mails about on-line schools and obtaining degrees and saw it as a good way to make an income.

10. In 2002, [redacted] was completely out of the car business and needed to start something else to make an income. Dixie Randock told [redacted] she needed someone to find out how to obtain certain documents such as notaries, apostilles and authentications and they need to come from Washington, DC. Prior to this, [redacted] didn't know what an apostille was. Dixie Randock sent [redacted] the plane ticket and money to travel from [redacted] to Washington, DC where [redacted] went "door to door" finding the information for Dixie Randock.

11. Dixie Randock had always told [redacted] SRU was not accredited in the United States and she knew she could not get accreditation in the U.S. Dixie Randock told [redacted] to accredit in the U.S. you must first have a brick and mortar building, then have classroom and instructors. If accredited you would be subject to accrediting agency inspections and would have to fully disclose the students and funds paid. Dixie Randock said SRU was an on-line institution only with students in the U.S. and overseas.

12. In 2002, SRU was recognized to do business in Russia. [redacted] believes [redacted] had something to do with setting up in Russia.

13. Dixie Randock told [redacted] the more accreditation you have the better it is to do business. SRU did not have instructors.

14. Heidi Lorhan, [redacted] and Dixie's [redacted] were advisors for SRU. All used alias names when dealing with the public. [redacted] stated none of them were college graduates. After applications were filled out by a prospective student, the "advisors" accessed the information provided and determined what college degree to award the student. [redacted] stated Heidi, Amy and [redacted] were not qualified to do the evaluations.

15. [redacted] observed his name (and [redacted]'s name) on the SRU web site as professors for the school. [redacted] told Dixie Randock to take his name off because what was said was false and he did not have the credentials.

16. [redacted] never saw Dixie or Steve Ran dock's name on the SRU web pages, but Dixie Ran dock's picture and name was on the A+ Institute site. When he questioned Dixie about this, she replied they wanted complete anonymity on the SRU site. [redacted]'s assumption was that the A+ site was legal and the SRU site was illegal.

17.[redacted] never actually acted as an "advisor" or "evaluator." Dixie Randock did ask him to advise and evaluate to assign degrees, but he elected not to.

18. Dixie Randock would average 15-20 hours per day on the computer conducting internet research. Dixie wrote the manuals for SRU.

19. Jallah [redacted], who was listed as a professor at SRU does not have a PhD and the information on his biography was false. Novak met [redacted] in Monrovia, Liberia and he is the manager of an internet café.

20. The Liberian professors that were listed on the SRU web site wrote their own biographies. Dixie Randock wrote the biography for [redacted] and [redacted] which [redacted] stated contained false information.

21 [redacted] stated one of the listed professors was a Liberian named [redacted] (also interviewed by SA [redacted] on 4/20/05). He met her at the Presidential inauguration in Monrovia, Liberia. She told [redacted] she had been living in [redacted] for the last 10-15 years and have come back to Liberia to lobby for a position with the new government. [redacted]old her he was in Liberia to get accreditation for SRU. She asked [redacted] to take her resume to his connections for employment possibilities. [redacted] took a photograph of [redacted] and placed it into his briefcase with other biographies that were to go on the SRU site. [redacted] mailed all the biographies back to Dixie Randock in Washington and forgot to take out [redacted]'s resume. All the biographies were put on the SRU web site to include [redacted]'s information. Soon thereafter, a reporter called [redacted] and asked her why her picture was on the SRU site. [redacted] called [redacted] and was very upset telling him she did not give him permission to have her information put on the SRU site.

22. Dixie Randock told [redacted] that [redacted] set up a fund through SRU for charitable contributions to Liberia.

23. [redacted]

[redacted].

25. James Monroe University (JMU) and Robertstown University (RU) were built by Dixie Randock to take the heat off of SRU (bad press and [redacted] Dixie Randock needed to make more money and actually built the web pages for JMU and RU.

26. SRU was not accredited by Liberia. Dixie Randock told [redacted] a letter had been written by [redacted] (a Liberian official) to the Washington, DC Liberian Embassy saying the accreditation was not real.

27. [redacted]

28. [redacted]'s wife, [redacted] would get templates from Dixie Randock. She would printout [redacted] documents to add to the packages. IEM was set up by Dixie Randock as an accrediting body to make the degree look more legitimate.

29. [redacted] was the primary SRU contact for [redacted] always expected to be taken out to dinner and was not alone 90% of the time. [redacted] usually took [redacted] to La Tomate in Washington, DC. It was Dixie Randock's idea to make an offer to [redacted] for assistance. Dixie Randock asked [redacted] to tell [redacted] she would pay him $400 per month for making sure when people all over the world called the Liberian Embassy to say they were accredited by the Country of Liberia. Embassy employees were also told to say SRU was accredited in Liberia. [redacted] gave [redacted] his personal bank account number [redacted] where the money was to be deposited. [redacted] stated these payments went on from August 2002 to sometime in 2004. On January 16, 2003, $10,000 was wired by SRU to [redacted] bank account. About 5 – 7 times, [redacted] asked for more money because he allegedly was not being paid by Liberia. During the period, [redacted] said his employees demanded payments. [redacted] stated everything paid to [redacted] was "bribe" money.

31. [redacted] had a conversation with Dixie Randock where they discussed the only way to get what they wanted (accreditation) from Liberia was to "bribe" officials. They discussed who they needed to "bribe" and what they would get from it.

32. [redacted] stated all monies paid to Liberian officials were "bribes," except for expenses. He said the bribe payments were made both in the form of U.S. currency and equipment.

33. [redacted] made it clear to Dixie Randock that to do business in any third world country they would have to conduct business the same as they did in Liberia (meaning bribing officials). Dixie Randock agreed and stated if that is what it takes to do business, that is what will be done.

34. [redacted] stated he paid bribes to the following Liberian officials: [redacted] during the [redacted] in Ghana, who at the time was [redacted] but who subsequently became [redacted]



35. [redacted] made currency payments to [redacted] at the [redacted] in Washington, D.C., as well as making at least one cash payment to him while in his hotel room in Washington, D.C. He also recounted making cash payments to [redacted] in Liberia or accompanying those individuals to a Western Union Office in Liberia for receipt of the bribe payment. [redacted] estimated that he paid [redacted]. He said [redacted] was paid $1,000 a month and estimated that he was paid a total of $20,000-$25,000. He said that after [redacted] in [redacted] told [redacted] that he wanted $1,000 a month to carry on what [redacted] was doing. He said he paid [redacted] $5,000 in U.S. currency and approximately $1,200 in equipment (fax/copy machine, desk top and laptop computer) for the [redacted]

36. [redacted] said that Dixie Randock suggested that he visit the Liberian Embassy in Washington, D.C. in order to get her "school" (Saint Regis University) "accredited" in Liberia. [redacted] traveled to Washington, D.C. and "just showed up" at the Liberian Embassy on 16th Street. [redacted] answered the door and he explained to the person that he wanted to obtain "accreditation" for an "online university." He then met [redacted] in a conference room and explained that he wanted Liberian government "accreditation" for Saint Regis University, which was situated in the State of Washington. [redacted] said he would make a telephone call to Liberia to find out what that would cost. [redacted] then said it would cost $4,000 to get "accreditation." The [redacted] haggled, and offered $2,000. They then agreed on $2,250. Over the next several months, [redacted] proceeded to pay much more to [redacted]. The Liberian Embassy began to receive numerous telephone inquiries about Saint Regis University and the Liberian Embassy's phone lines were quite busy. [redacted] then told [redacted] the employees at the embassy were complaining and he demanded they be paid by the Randocks. Dixie Randock told [redacted] to tell [redacted] she would pay the employees $400 a month if the employees were instructed on what to represent to the public about Saint Regis University.

37. Dixie Randock assigned [redacted] the e-mail degrees@university-services.net.

38. The National Board of Education (NBOE)was an entity set up by Dixie Randock as the parent company that owned SRU. At the beginning in Liberia, everything went through NBOE. Once Dixie Randock was established in Liberia, she wanted to use NBOE to sell accreditations to other on-line schools.

39. [redacted] stated [redacted] (one of the SRU professors) started a fund with the SRU alumni to help the Liberian people. He came up with an idea to send 300 Liberian to the University of Liberia.

40. Dixie Randock told [redacted] everyone wanted to talk to Dr. Thomas Carper and at one point, she said they needed to "kill the name."

41. In either December 2003 or January 2004, [redacted] went to [redacted] and met with [redacted]

[redacted] Steve and Dixie Randock and [redacted] to discuss the meeting with the United Auto Workers (UAW). Dixie Randock told Novak he needed to attend the meeting. They met at the hotel Novak was staying in. Shafig told Novak that in six months, he could be making a million dollars on the UAW deal. The next morning Novak attended a meeting with Shafig and Carlson and UAW managers regarding SRU. Steve and Dixie Randock did not attend. Shafig put together a speech about what the UAW needs (regarding education) and how he could fulfill the needs by issuing SRU degrees. The meeting lasted 20 minutes and there were approximately six to seven UAW managers present. Carlson also spoke for a couple of minutes. When the meeting was over Novak and Carlson were told to wait outside. After about another 30 minutes, [redacted] told Novak and Carlson SRU had a deal with the UAW.

42. Soon after the search warrant was conducted at [redacted]'s residence, Dixie Randock called him and asked if he had talked to authorities. [redacted] replied he was answering questions 100%. Dixie Randock told [redacted] they had done nothing wrong and said they should stick together.

[redacted]
Investigator

*This report is the property of the U.S. Attorney's Office. It and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. § 552.***



**U.S. Department of Justice**
*United States Attorney*
*Eastern District of Washington*

DATE: February 8, 2006

**Interview Record**

**Interview of:** [redacted], [redacted], [redacted]., [redacted]

**Interviewers:** [redacted]

**Interview Location:** Teleconference between the United States Attorney's Office, Eastern District of Washington, Department of Justice Fraud Section, Criminal Division and [redacted] and [redacted] in [redacted]

**Purpose of Interview:** [redacted] his attorney [redacted]l, and AUSA [redacted]s agreed this interview would be conducted under terms of a free talk letter signed by [redacted] and [redacted]. [redacted] provided the following information:

1. [redacted] would testify under oath that all payments made to [redacted] were "bribes."

2. In March 2002, Dixie Randock asked [redacted] to travel to Washington, DC on a fact finding mission to gain accreditation for Saint Regis University (SRU), James Monroe University (JMU) and Robertstown University (RU). [redacted] had just closed a car business and was looking for work. [redacted] was sent to the Liberian Embassy in Washington, DC to see what it would take to get Liberian accreditation. [redacted] was also asked to determine how to obtain apostilles and authentications from the U.S. State Department. [redacted] had never been to Washington DC and thought it would be an interesting trip. Dixie Randock came up with Liberia as a country to do business with since it was a poor country and she thought Liberia "would likely cooperate" with the accreditation.

3. [redacted] went unannounced to the Liberian Embassy and knocked on the door. The door was answered by [redacted] stated his intentions and was escorted to a conference room where he was introduced to [redacted]k explained he wanted Liberian accreditation for SRU, JMU and RU and was initially told by [redacted] it would cost $4,000 for the Liberian documents. [redacted] and [redacted] then negotiated the price down to $2,400. [redacted] told [redacted]k he would have to get with the right people in Liberia and the documents would come directly from the Liberian Department of Education. [redacted] stated after talking to [redacted]r he understood the conversation to be about a bribe, there was no set schedule of fees, and [redacted] would have to go through various people in Liberia to get the documents. [redacted] requested the $2,400 be paid to him in U.S. Currency.



4. Once gathered the information in Washington, DC he shared the information with Dixie Randock. $2,400 was wire transferred to Western Union which was picked up by met with either later that day (the day he went to the embassy) or the day after at the restaurant. gave $2,400 in U.S. Currency. had specified the method of payment and it was to be in U.S. Currency. asked how long it would take to get the documents and replied about two weeks. It actually took four weeks to get the documents.

5. The Liberian documents were initially sent to in Washington, DC who then sent them to in via DHL. looked at the documents and then sent them to Dixie Randock in Washington State. Dixie Randock was excited when she got the documents, but had questions about the seals and paper (paper was different sizes). The documents did not look professional and were signed by and stated he received these documents by only verbally telling about SRU and by showing a sample pamphlet about SRU. never filled out any application paperwork or show any real details about the school.

6. Dixie Randock requested contact and obtain better (more professional) documents. called and told him the "board" he represented was not happy with the documents. stated because of the war in Liberia, that was the best he could do. then related this information to Dixie Randock.

7. At some point, Dixie Randock suggested go to Liberia himself to get better documents. contacted who issued him a visa for $200.

8. During the end of 2002, made his first trip to Liberia (about one month long). He met an individual who identified himself as ' and who said he was in charge of higher education in Liberia. met in a run down office (no lights, walls falling in and a table with three legs) and asked him for better documents. told he wanted $3,500 to $4,000 for the documents which was negotiated down to $2,800. was not required to fill out any application for this accreditation either and did not want to see any documents reference SRU, JMU or RU. wanted to be paid in U.S. Currency and agreed to meet at his hotel room four to five days later. understood the payment to be a "bribe" because the payment was to take place in his hotel room and there was no receipt for payment. contacted Dixie Randock who in-turn wired the money via Western Union to stated Dixie Randock knew it was a "bribe." received the new documents from then sent the documents via DHL to Dixie Randock.

9. paid other payments to not only for documents, but for other tragedies in s life. stated every time he did business with a Liberian, they wanted more money. paid a total of $10,000 to $12,000 from 2002 – 2004. s payments always occurred in Liberia and were by wire transfer to Western Union. The documents were still not at the level and Dixie Randock requested. always had excuses about the quality of the documents blaming it on the war in Liberia.

10. During 2003, [redacted] Liberian [redacted] wrote a letter to the Liberian Embassy in Washington, DC saying SRU was not accredited. This letter made its way onto the internet and made Dixie Randock very mad. Dixie Randock sent [redacted] back to Liberia to start the accreditation process over again. [redacted] went again for about one month and this time met with [redacted] requested he be paid $400 per month and it would cost $5,000 to $6,000 for the accreditation paperwork. [redacted] was paid by a Western Union wire in U.S. Currency for the documents containing his signature. [redacted] believed the payments were "bribes." [redacted] did not fill out any application paperwork nor did [redacted] request any information on SRU. [redacted] explained the payments were "bribes" to get accreditation. [redacted] stated during the process, he was buying an "accreditation" vs. "getting accredited."

11. After the 1st accreditation was received, Liberian Embassy personnel were spending most of their day answering the phone reference SRU. [redacted] told [redacted] he and the employees would have to be paid to answer phones. [redacted] was given $400 per month and the employees $200 - $300. The payments were for the Liberians to answer the phones and "provide positive answers reference SRU." Dixie Randock told [redacted] the comments via SRU must be positive (i.e. they are accredited and that the "accreditation" is valid) if the Liberians were to receive any more money.

12. [redacted] stated one time Steve and Dixie Randock went with him to Washington, DC. They all had dinner with [redacted] and [redacted]

13. [redacted] stated he made a payment to [redacted] while he was at [redacted] paid him $1,000 in U.S. Currency for [redacted]s election campaign and for [redacted] to assist with SRU.

14. At Dixie Randock's request, [redacted] arranged for [redacted] to receive a $400 monthly salary from SRU and also provided him with equipment (computers, fax and copy machines). [redacted] had an account in [redacted] The payments were wired to that account and then transferred to a bank in [redacted] The payments were made so that [redacted] would also answer questions regarding SRU and say they were "accredited."

15. [redacted] stated he made a $5,000 cash payment to [redacted] at [redacted]'s hotel in Washington, DC. The payment was for documents and to help [redacted] financially with items such as car insurance.

16. [redacted] stated [redacted]) was the [redacted] at the time he was dealing with [redacted] and [redacted] did not get along with [redacted] ultimately got [redacted] removed form the embassy for a period of time. [redacted] set up a meeting with [redacted] at the embassy to "be on the same program" as [redacted] made a $1,000 payment to [redacted] as a "bribe." [redacted] wanted monthly payments, but was not in office long enough to receive any money.

17. [redacted] arranged for [redacted] through Dixie Randock to receive $1,000 a month for administering an office for SRU in Monrovia, Liberia and to be the middle man between SRU and the Liberian Ministry of Education. The money was wired via Western Union to [redacted]

18. There was a letter sent (per Dixie Randock) to [redacted] higher education in Oregon, reference SRU signed by [redacted]. It was sent because Oregon was making problems for SRU. [redacted] paid [redacted] to send the letter.

19. [redacted] stated [redacted] was aware the money was being paid to Liberian officials. [redacted] handled all the payments and wire transactions. [redacted] remembers at least one occasion where he mentioned the word "bribe" to her.

20. [redacted]

21. Dixie Randock set up imposter Liberian Embassy web sites with [redacted]'s approval. At that time the government of Liberia did not have an official web site. If a SRU consumer either went to the web site, e-mailed, or called the embassy, a lady named [redacted] who worked at the embassy would answer their questions. [redacted] had a direct dialog with Dixie Randock whenever there was a problem with either of the fake Liberian Embassy web sites.

22. Dixie Randock asked [redacted] to issue letters from the Liberian government to fix the problems with the Georgia teachers (teachers that had used SRU degrees to get extra pay and who were dismissed from service). [redacted] stated he didn't think [redacted] wanted to get involved.

23. In Jan 2005, [redacted] attended a meeting with [redacted], and U.S. Embassy staff in Monrovia, Liberia at the U.S. Embassy. The U.S. Embassy was holding up U.S. education money for Liberia until the SRU issue was resolved. The Liberians told the U.S. Embassy officials SRU gained their accreditation from Liberia.

24. [redacted] stated the document that shows SRU was chartered by the Liberian legislature in 1984 was false.

25. [redacted] stated payments for [redacted] were wired to [redacted]'s personal bank account at [redacted]k. [redacted] knew the money was not going to the government of Liberia.

26. [redacted] stated he paid a $1,000 to $2,000 "bribe" to [redacted] who worked at the Liberian education building.

27. [redacted].

28. Dixie Randock told [redacted] that prior to his involvement with SRU, Dixie Randock was involved in obtaining "accreditations" from Italy, Dominica and Russia.

29. [redacted] stated all trips to Liberia, and other expenses associated with obtaining "accreditations," apostilles, authentications, etc. were paid for by Dixie and Steve Randock.

[redacted]
Investigator

*This report is the property of the U.S. Attorney's Office. It and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. §552.***



**U.S. Department of Justice**
*United States Attorney*
*Eastern District of Washington*

DATE: March 1, 2006

## Interview Record

**Interview of:** [redacted]

**Interviewers:** [redacted]

**Interview Location:** Teleconference between the United States Attorney's Office, Eastern District of Washington, [redacted] and [redacted]

**Purpose of Interview:** [redacted] attorney [redacted] and [redacted] agreed this interview would be conducted under terms of a free talk letter signed by [redacted] and [redacted] [redacted] provided the following information:

1. [redacted] traveled to Washington, DC with Steve and Dixie Randock staying in the same hotel. Steve and Dixie Randock had a room about three doors down from [redacted]'s room on the same hotel floor. [redacted] gave [redacted] directions to the hotel. While [redacted] was en-route, [redacted] walked down to the Randock's room where Steve Randock provided him with $4,000 (in large bills, no lower than $50's) in U.S. currency. [redacted] brought the money back to his room and met with [redacted] [redacted] paid [redacted] the $4,000 and walked with him into the hallway which was within "earshot" of the Randock's room (whose door was ajar). [redacted] had a discussion with [redacted] about [redacted] getting into another political office and that he could be financial backed by Saint Regis University

2. During August 6 – 27, 2003, [redacted] and [redacted] flew from Dulles International Airport to Ghana for the Liberian peace talks. The purpose of the trip was to get [redacted] his old job back at the Liberian Embassy in Washington, DC and lobby the new government to recognize Saint Regis University. The trip and expenses were 100% paid for by Saint Regis University.

[redacted]
Investigator

*This report is the property of the U.S. Attorney's Office. It and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. § 552.***

**U.S. Department of Justice**
*United States Attorney*
*Eastern District of Washington*

DATE: May 5, 2006

**Interview Record**

**Interview of:** [redacted]

**Interviewers:** Special Agent [redacted], Federal Protective Service and Investigator [redacted] USAO.

**Interview Location:** Teleconference between Investigator [redacted] United States Attorney's Office, Eastern District of Washington, Special Agent [redacted] Federal Protective Service, [redacted] and [redacted] (Counsel for [redacted].

1. [redacted]

2. Dixie Randock introduced [redacted] to [redacted] in 2003 via e-mail. [redacted] became involved with Randock because of the National Board of Education (NBOE) and Liberia. NBOE was "the mother ship" for Saint Regis University (SRU), James Monroe University (JMU) and Robertstown University (RU). Randock was having problems with [redacted] and wanted [redacted] to work with him. [redacted] never met [redacted], only spoke to him on the phone once, but did have numerous e-mail conversations with him. Around March 2004, [redacted] tried to get [redacted] to work for him.

3. Dixie Randock first dealt with [redacted] using an alias (male) name. After a period of time, Dixie Randock started using her real name and [redacted] became upset that he was working with a female.

4. Once Dixie Randock established NBOE, Dixie thought she could sell the accreditation to other schools and call them "affiliates." [redacted] and [redacted] bought NBOE accreditation from Dixie Randock.

5. [redacted] contacted Liberia and had [redacted] sign documents for his [redacted] College. [redacted] also hired a person in South and Central America to get various country accreditations for his school. At one time [redacted] had an accreditation in Malaysia.

6. [redacted] stated [redacted] is also big into making fraudulent diplomatic passports, driver's licenses and ID's. They are all made in Belgium.

7. [redacted] stated Dixie Randock operated Interfaith Education Ministries (IEM).

8. [redacted] stated the business relationship between [redacted] and Dixie Randock started way before he became involved with Dixie and [redacted] was not involved with SRU when he started in 2002.

9. [redacted] stated [redacted] knows a lot about diploma mills and the involvement of various people in the business. [redacted] said that all the diploma mills network and talk to each other.

[redacted]
Investigator

*This report is the property of the U.S. Attorney's Office. It and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. § 552.***