James A. McDevitt
United States Attorney
Eastern District of Washington
George J.C. Jacobs, III
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone:  (509) 353-2767

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )        CR-05-180-1-LRS
         vs.                   )
                               )        United States' Sentencing
DIXIE ELLEN RANDOCK,           )        Memorandum
                               )
                Defendant.     )
                               )
                               )
                               )

         Plaintiff, United States of America, by and through James A. McDevitt,

United States Attorney for the Eastern District of Washington, and George J.C.

Jacobs, III, Assistant United States Attorney for the Eastern District of

Washington, submits the following Sentencing Memorandum.

         The Presentence Investigation Report ("PSR"), dated May 16, 2008,

correctly calculates the Defendant's advisory Guidelines Total Offense Level as

35, her Criminal History Category as I, and her advisory Guidelines sentencing

range of imprisonment as 168-210 months.  PSR, para. 300.  The PSR also

correctly reflects that her Guidelines range is restricted by the maximum penalty of

5 years imprisonment, pursuant to USSG § 5G1.1(a).  *Id*.  Under the terms of the

plea agreement, the parties have agreed to recommend that the Court impose a

sentence of 36 months.  The United States recommends that the Court impose a 36

month term of imprisonment.  The Defendant opposes this recommendation and

requests that the Court allow her to serve all 36 months in home confinement.  The

United States' Sentencing Memorandum - 1

P80605dsd.GJA.wpd

United States opposes the Defendant's recommendation because a 36-month home confinement sentence does not reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the Defendant.

To comply with the requirements of *United States v. Booker*, 543 U.S. 220 (2005), a district court must sufficiently consider the Guidelines, as well as the other factors listed in 18 U.S.C. § 3553(a). *United States v. Crawford*, 520 F.3d 1072, 1076 (9th Cir. 2008).

**I.    18 U.S.C. § 3553(a)(1)  Factors – Nature / Circumstances of the Offense – History / Characteristics of Defendant**

The Defendant, a high school dropout and former real estate agent who had no experience running a legitimate institution of higher learning, was the master-mind of a sophisticated global internet scheme that sold 10,815 degrees and related academic products to 9,612 buyers in 131 countries for $7,369,907. *See Analysis of the Operation Gold Seal "Buyers List,"* prepared by the United States Department of Homeland Security, United States Secret Service, at pp. 2-8 (hereinafter referred to as *Exhibit A*).  The Defendant's scheme spread quickly outside the United States into most areas of the world, with the aid of the internet. The Defendant developed and oversaw the scheme.  She pursued it enthusiastically and continued to develop ways to make money and avoid law enforcement detection.  The income generated in the scheme was hidden in various bank accounts, including off-shore accounts.  She is a shrewd business person who kept her name off all fraudulent documents and internet sites, hid behind multiple fake identities, conducted and marketed her fraudulent scheme with extreme success over multiple years, and conducted her affairs in a manner to avoid law enforcement detection.  On one of her "school" internet sites, the Defendant led the

United States' Sentencing Memorandum - 2
P80605dsd.GJA.wpd

public to believe that her "school" had a grand campus with grand buildings (the home page contained a photograph of Blenheim Palace, the ancestral home and birthplace of Sir Winston Churchill, in Woodstock, England). The reality was that the Defendant's "schools" had no grand campus or buildings. See *Exhibit AA*, Photographs of Saint Regis University's campus in Liberia and address locations that the Defendant listed on her internet sites for her other "schools," including James Monroe University and Robertstown University. The Defendant's "schools" had no qualified faculty, no academic standards, and no legitimacy. They simply provided the Defendant with an opportunity to make money. Based on the Secret Service's analysis of the Defendant's business records, the Defendant's diploma mills' monthly revenues routinely exceeded $100,000 between February 2002 and January 2005. See *Exhibit A-2*. The monthly revenues dropped a bit when the Government of Liberia declared Saint Regis illegal in the latter part of 2004. *Id.*

The Defendant employed Richard Novak to influence the Liberian Government by paying bribes to some of its officials in order to obtain their agreement to provide accreditation to Saint Regis University. *PSR*, para. 315. The Defendant was the organizer and leader of the scheme. She got her daughter involved in the scheme. *PSR*, para. 229. The Defendant also got several others involved in the scheme, including her father's wife. *PSR*, para. 229. The scope of the offense was massive, and the totality of the harm cannot be adequately measured.

The Defendant is fifty-eight years old. She attended local schools until dropping out at the age of sixteen, when she began to work. *PSR*, para. 286. She has taken some courses at a local community college. *PSR*, para. 288. She holds no undergraduate or graduate school degrees. At the age of twenty-two, the Defendant began selling real estate and became a broker at the age of twenty-four. *PSR*, paras. 290-91. She has held real estate licenses in the States of Washington and Idaho. *PSR*, para. 290. According to the Defendant, she made a good living in

United States' Sentencing Memorandum - 3

P80605dsd.GJA.wpd

1   real estate.  *Id.*  She worked for Century 21 between 1989 and 1993, when she left

2   to open her own brokerage.  *PSR*, para. 291.  Between 1994 and 1998, the

3   Defendant operated Century 21 Randock in Mead, Washington.  *PSR*, para. 292.

4   In approximately 1994, the Defendant created a real estate school, A+ Institute in

5   Mead, Washington.  In 1999, the Defendant began operating diploma mills and

6   continued to do so until the United States Secret Service executed Federal search

7   warrants on August 11, 2005.

8
9   **II.   18 U.S.C. § 3553(a)(2) Factors – Need for Sentence Imposed To Reflect
        Seriousness of the Offense – To Promote Respect for the Law – To
        Provide Just Punishment for the Offense – To Afford Adequate
10       Deterrence to Criminal Conduct  – To Protect the Public from Further
        Crimes of the Defendant**

11
12          *A.  Defendant's Offense Conduct Put the Public at Significant Risk of
              Danger*
13

14          The Defendant's offense conduct threatened homeland security.  See, e.g.,

15   *Exhibit B*, Sarah Antonacci, *Diploma Mills Pose Degrees of Danger*, The State-

16   Journal-Register, February 19, 2008 ("Academic documents that indicate a person

17   has certain kinds of training . . . can help a person obtain an H-1B visa for entry

18   into the United States"); *Exhibit C*, Bill Morlin, *Bogus Degrees Offer Way to U.S.*,

19   The Spokesman-Review, August 16, 2005, at A1; *Exhibit C-1*, Bill Morlin, *Bill

20   Targets 'Diploma Mills':  Spokane Criminal Case Inspires Federal Legislation*,

21   The Spokesman-Review, November 11, 2007, at B1 ("The revelation that potential

22   terrorists could use bogus degrees to enter the United States caused homeland

23   security concerns that reached the highest levels of government").  The

24   Defendant's conduct put the public at a significant risk that foreign nationals,

25   including potential terrorists, could have gained entry into the United States with

26   fraudulent degrees purchased from the Defendant.  With the click of a mouse and a

27   few hundred dollars, the Defendant could have facilitated a potential terrorist's

28   ability to gain entry into the United States.  The Defendant also promoted world-

United States' Sentencing Memorandum - 4

1  wide sales by advertising on her internet sites that foreign nationals who were

2  seeking entry into the United States could purchase an "H1B Visa Credential

3  Evaluation" for $110 from her Wyoming corporation, Academic Credential

4  Assessment Corporation.  The Defendant did not have the training, experience, or

5  professional qualifications to perform such evaluations.

6      The Defendant's offense conduct also put the public at risk that thousands of

7  unqualified individuals who purchased degrees from the Defendant are now

8  providing substandard "professional" services in the medical, engineering,

9  education, counseling, and other fields.  The risks to the public which are endemic

10  to the sale of fraudulent academic products by diploma mills, such as the

11  Defendant's, have been described in *Degrees of Deception: Are Consumers And*

12  *Employers Being Duped By Online Universities And Diploma Mills?*, by Creola

13  Johnson, Associate Professor, The Ohio State University, Michael E. Moritz

14  College of Law, Journal of College and University Law, vol. 32, No. 2, pp. 411-89

15  (hereinafter *Degrees of Deception*),

16      [b]esides the potential to defraud employers, online diploma mills and
       substandard unaccredited schools put the public at risk of danger from
17      their 'graduates' who perform professional services, such as when a
       mother watched her eight-year old daughter die after a doctor with
18      fake degrees advised taking her off insulin.  In addition to posing a
       risk of harm to the public, numerous online degree providers actively
19      deceive *unsophisticated consumers* about their accreditation status
       and their degree-granting practices.  (emphasis in original).  Many of
20      these degree providers confer degrees to consumers by heavily
       crediting their prior life experiences – such as employment history and
21      previous education – and requiring them to complete substantially less
       academic work than is required at traditional accredited universities.
22      Playing on working adults' desperation for increases in wages and
       employment opportunities, substandard degree providers assure
23      prospective students that their practices are perfectly legal.

24  *Degrees of Deception*, at 415-16.

25

26      *1.  United States Department of Homeland Security,*
       *United States Secret Service Agent, Acting in*
27      *Undercover Capacity as a Syrian Military Officer,*
       *Purchases Three Science Degrees from the Defendant*

28

United States' Sentencing Memorandum - 5

P80605dsd.GJA.wpd

An example of the dangers the Defendant's offense conduct posed to the public is shown by the United States Secret Service's undercover purchase of three degrees from her diploma mill. On April 18, 2005, a United States Secret Service Special Agent, acting in an undercover capacity as a retired engineering officer from the Syrian Army and using the undercover identity, Mohammed Abdul Syed, accessed the Defendant's James Monroe University internet site, completed a "Free Assessment of Competency Quotient & Prior Learning," and electronically submitted it to the Defendant. *Exhibit D*, at 36480-84. In the on-line form, the undercover agent indicated that his place of birth was "Damascus, Syria" and his greatest strength" was "Intelligence." *Exhibit D*, at 36480. The undercover agent indicated that his "work in the Syrian Army is classified" and his "[c]urrent work projects involve biochemical analysis and development of medical implementation devices." *Exhibit D*, at 36483. On April 21, 2005, the undercover agent received an email notification from the Defendant's James Monroe University internet site that "[y]our documentation is currently being reviewed for verification and authenticity. This process can take up to 48 hours, however we will do our best to complete your assessment promptly." *Exhibit D*, at 360412. On May 13, 2005, the undercover agent contacted the Defendant's internet site notifying her that he had not yet received his degree review from James Monroe University. *Exhibit D*, at 360411. On the same day, the undercover agent received the following notification, "Dear Sir, [o]n your application you did not indicate which degree you were seeking. Please let me know which degree you are to be evaluated for and I will have a response within 24 hours." *Id*. On May 14, 2005, the Defendant's diploma mill sent the following email, "Dear Mohammed, I apologize, we do not issue certain engineering degrees as we do not have faculty in that area. We can grant one in environmental engineering or one in chemistry, but not chemical engineering." *Exhibit D*, at 360409. On May 17, 2005, the undercover agent

United States' Sentencing Memorandum - 6

P80605dsd.GJA.wpd

1    notified the Defendant that his ". . . #1 objective [in purchasing a degree from

2    James Monroe University] is H1-B."  *Exhibit D*, at 360409.

3        On May 17, 2005, the Defendant notified the undercover agent by email that

4    James Monroe University's "Office of Admissions is pleased to announce that you

5    have been approved for" the following degrees:  Bachelor of Science in

6    Environmental Engineering; Bachelor of Science in Chemistry; Master of Science

7    in Environmental Engineering; Master of Science in Chemistry.  *Exhibit D*, at

8    360406.  The undercover agent then purchased from the Defendant three degrees

9    (Bachelor of Science in Chemistry, Master of Science in Chemistry, and a Master

10    of Science in Environmental Engineering), Official Student Transcripts, and

11    Alumni ID Cards.  *Exhibit D*, at 36485-498.

12            *2.  Counterfeit Degrees / Volume / Type of Degrees*
              *Defendant Sold*

13
14        The serious nature of the Defendant's conduct is demonstrated by her sale of

15    counterfeit degrees in the names of legitimate universities and schools.  The

16    Defendant used the names of 77 different legitimate schools and, at a minimum,

17    the names of 121 unrecognized schools in her sales of fraudulent academic

18    products over a five year period.  *Exhibit A*, p. 9.  It is also demonstrated by the

19    volume and type of degrees she sold.  With the click of a mouse, the Defendant

20    gave thousands of consumers an academic credential they had not earned.  With

21    the click of a mouse, the Defendant spread through society thousands of

22    unqualified and unskilled workers in a variety of professions.  With the click of a

23    mouse, the Defendant devalued the academic credentials that millions of people

24    had honestly earned, and at great expense and sacrifice, from legitimate institutions

25    of higher learning.

26        The United States Secret Service's analysis of records seized in the

27    Operation Gold Seal investigation revealed that the Defendant sold 114

28    professorships, 1,145 doctorate-level degrees, 1,866 masters-level degrees, 3,349

United States' Sentencing Memorandum - 7

P80605dsd.GJA.wpd

bachelor-level degrees, and 3,425 high school diplomas. *Exhibit A*, p. 15. The Defendant sold 859 degrees in the healthcare field, including 47 Nursing degrees, 36 Pediatric, OB-GYN, General Medicine, and Respiratory Medicine degrees, 1 Surgery degree, 1 Oncology degree, 4 Radiology degrees, 10 Dentistry degrees, 349 Psychology, Counseling, and Psychiatry degrees, 14 Pharmacy degrees, and 14 Substance Abuse Counseling and Treatment degrees. *Exhibit A*, pp. 18-19. The Defendant also sold 816 Engineering degrees, including 21 Aviation & Aerospace degrees, 438 Computer Engineering degrees, 14 Chemical Engineering degrees, and 108 Mechanical Engineering degrees. *Exhibit A*, pp. 20-21. The Defendant also sold 546 Education degrees, including 57 in Early Childhood Education and 27 in Special Education. *Exhibit A*, pp. 21-22. As a result of the Defendant's conduct, an unqualified nurse or doctor or other health care worker may be tending to a patient or an unqualified person may be teaching young children.

### 3. Defendant Verified False Academic Credentials to Third Parties

The serious nature of the Defendant's offense conduct is further demonstrated by the fact that she back-stopped her fraud by creating the Official Transcript Verification Center, the Official Transcript Archive Center, and www.transcriptrecords.com which enabled her to verify to third parties, including employers in the private and public sectors, the false academic credentials she manufactured. When interviewed by the United States Secret Service on August 23, 2005, Defendant Roberta Markishtum, stated that while working for the Defendant's diploma mill approximately 1,000 businesses, schools, and / or employers called to verify the "schools" legitimacy. *Exhibit E*. Defendant Markishtum also told the United States Secret Service that approximately 500-600 employers alone called for employee education verification in order to hire a prospective employee. *Id.*

United States' Sentencing Memorandum - 8

P80605dsd.GJA.wpd

1    The serious nature of the Defendant's conduct is also demonstrated by the

2   fact that she attempted to set up foreign consulates and to pay $2,000 a month to a

3   foreign national in order to verify her fraudulent academic products.  See *PSR*,

4   paras 190-91.  In an August 26, 2004, email, the Defendant using the false identity,

5   Thomas Carper, requested the foreign national "to grant us with some diplomatic

6   documents in the rank of Consul or Above in the name of . . . and Steve Randock

7   [Sr.] in Washington State.  If we get these two documents we will set up a

8   Consulate on our own for you and we will take care of these expenses.  Then the

9   Consulates will be used as place[s] of verification of accreditations and that will be

10  helpful and useful to us." *PSR*, para. 190.  Had the United States Secret Service

11  not intervened, she may have succeeded.  In short, the Defendant's offense conduct

12  knew no boundaries.

13          *4.  Defendant's Offense Conduct Has Been the Impetus*
            *for Federal Legislation and State Legislation*
14
        The serious nature of the Defendant's offense conduct is further

15  demonstrated by the fact that it has been the impetus for Federal legislation.  See,

16  e.g., *Exhibit C-1*, Bill Morlin, *Bill Targets "Diploma Mills," Spokane Criminal*

17  *Case Inspires Federal Legislation*, The Spokesman-Review, November 11, 2007,

18  at B1, 9.  Congress recognizes that institutions of higher education, businesses and

19  other employers, professional licensing boards, patients and clients of degree

20  holders, taxpayers, and other individuals need to be protected from the risks posed

21  by diploma mills.  *Exhibit F*.  Lawmakers in the State of Washington also

22  introduced legislation to strengthen the criminal laws against diploma mills.  See

23  *Exhibit G*.  The Defendant was indicted on October 5, 2005.  On June 7, 2006,

24  several new laws (R.C.W. 9A.60.070; 28A.405.260; 28B.50.463; 28B.85.220)

25  came into effect in the State of Washington which target the issuance or use of

26  false academic credentials.  *Exhibit H*.

27          *5.  General Deterrence - Respect for the Law*

28

United States' Sentencing Memorandum - 9

P80605dsd.GJA.wpd

1   This case presents the Court with a singular opportunity to deter diploma

2   mills and diploma fraud nationwide. The Defendant shipped academic products to

3   consumers in all fifty states. See, *Exhibit A* and *A-1*. She operated her scheme

4   from the States of Washington, Idaho, Washington, D.C., Delaware, Arizona, and

5   Liberia. She sold fraudulent academic products to consumers in 131 countries.

6   Those false academic credentials are now being used in foreign markets. See, e.g.,

7   *Exhibit L*, November 23, 2005, Letter to James A. McDevitt, United States

8   Attorney for the Eastern District of Washington, from The Swedish National

9   Agency for Higher Education and October 20, 2005, Letter to James A. McDevitt,

10  United States Attorney for the Eastern District of Washington, from the

11  Netherlands Organization for International Cooperation in Higher Education,

12  Information Centre on Diploma Mills. The instant prosecution has received

13  publicity at the local, national, and international level. See, e.g., *Exhibits B, C, C-*

14  *1, I* and *J*. General Deterrence in this case depends upon the public seeing some

15  consequence for the Defendant's actions beyond a home-confinement sentence.

16  The goal of deterrence rings hollow if a prison sentence is not imposed in this case.

17  Imposing a 36-month term of imprisonment will promote respect for the law and

18  act as a deterrent to other potential diploma mill operators.

19              6. *Specific Deterrence of Defendant From Further Crimes*

20              Another important goal of criminal sentencing is to protect the public "from

21  further crimes of the defendant." 18 U.S.C. § 3553(a)(2). A 36-month term of

22  imprisonment will serve that end. It appears that the Defendant has not fully

23  accepted responsibility for her criminal conduct. To this day, the Defendant

24  persists in her belief that she was running a "diploma business" not a diploma mill.

25  On May 14, 2008, the Defendant provided a written statement to the United States

26  Probation Office regarding her involvement in the offense. PSR, paras, 228-40.

27  The word "diploma mill" is not mentioned once. She uses the word "activity" and

28  explains that the reason she "began the *activity* was because [she] believed [she]

United States' Sentencing Memorandum - 10

P80605dsd.GJA.wpd

1  was giving recognition to people like [her], who learned on their own." *PSR*, para.

2  228 (emphasis added).  The Defendant writes that she "truly believed that she was

3  not breaking any law because there were no laws against granting degrees." *Id*.

4  There is a disconnect between the Defendant's words and her actions.  If the

5  Defendant truly believed that she was breaking no laws, she had no reason to wrap

6  herself within an endless cloak of subterfuge, unreadable signatures, secrecy and

7  false identities.  If the Defendant truly believed that she was breaking no laws, her

8  photograph, name, work and true educational background would have been

9  advertised on her internet sites and her name would have been affixed (not the

10  names of fictitious university officials) on the degrees she sold.  If the Defendant

11  truly believed that what she was doing was legal, she would not have angrily asked

12  Defendant Kenneth Pearson, "Are you trying to get me thrown in jail?" when he

13  had not removed her name from domain registrations.  *PSR*, para. 160.  If the

14  Defendant truly believed that what she was doing was legal, she would not have

15  instructed Defendant Roberta Markishtum to lock the doors to the office if a

16  reporter came questioning the operation.  *Exhibit E.*

17      The Defendant knew exactly what a diploma mill was.  In fact, in an August

18  21, 2004, email to her husband, she admitted that she needed "to approach and

19  accredit all of [person's name not redacted in original email] 's mills," and that [h]e

20  actually has [school name not redacted in original email] and [school name not

21  redacted in original email] thru that silly ADLP that I made for him years ago."

22  See *Exhibit K.*

23      The Defendant argues that a sentence of thirty-six months home confinement

24  is a reasonable sentence.  The United States believes that such a sentence would

25  not reflect the seriousness of the offense, promote respect for the law, provide just

26  punishment, afford adequate deterrence to criminal conduct, or protect the public

27  from further crimes.  The Defendant has been convicted of a serious offense.

28

United States' Sentencing Memorandum - 11

P80605dsd.GJA.wpd

1   Under the statute, her sentence cannot be greater than a five year term of

2   imprisonment.  Her advisory guidelines range of imprisonment is 168-210 months.

3       The Defendant knew her conduct was illegal yet she persisted in it.  Had the

4   Secret Service not interdicted her activities, she would still be selling degrees.

5   Sentencing the mastermind of a global internet scheme to thirty-six months home

6   confinement would not reflect the seriousness of the offense, promote respect for

7   the law, provide just punishment, afford adequate deterrence to criminal conduct,

8   or protect the public from further crimes of the Defendant.

9       There is, perhaps, one point on which both parties can agree: that the

10  sentence imposed on the Defendant could promote the public good.  The United

11  States submits that the public good would best be served by the imposition of a

12  thirty-six month prison sentence.  Such a sentence could instantaneously deter

13  diploma mill operators on a national scale.

14

15                              **Conclusion**

16      For the foregoing reasons, the Defendant should be sentenced to a term of

17  imprisonment of 36 months, followed by three years of supervised release.

18

19      DATED June 5, 2008.

20                              James A. McDevitt
                                United States Attorney

21

22                              s/George J.C. Jacobs, III

23                              George J.C. Jacobs, III
                                Assistant United States Attorney

24

25      I hereby certify that on June 5, 2008, I electronically filed the foregoing with

26  the Clerk of the Court using the CM/ECF System which will send notification of

27  such filing to the following, and/or I hereby certify that I have mailed by United

28  States Postal Service the document to the following non-CM/ECF participant(s):

United States' Sentencing Memorandum - 12

P80605dsd.GJA.wpd

Phillip Wetzel
901 North Adams
Spokane, WA 99201-2051

Brenda G. Challinor
U.S. Sentencing Guidelines Specialist
United States Probation Office
920 West Riverside, Room 540
Spokane, Washington 99201

s/George J.C. Jacobs, III

George J.C. Jacobs, III
Assistant United States Attorney

United States' Sentencing Memorandum - 13